Mike Bordelon and Breezy Shores v. Baldwin County, AL And Jamie Frawley is here for the appellate. Jonathan Halton is here for the appellees. And Ms. Frawley, you may begin when you're ready. My name is Jamie Frawley and I represent the Baldwin County appellants in this matter. We ask that this court reverse the final judgment in favor of Breezy Shores and Ms. Bordelon for an alternative that the award of $764,289 be reversed. The district court made three overarching analytical errors in this case. The first one is that it improperly focused on project value, that is specifically the value of building a three-story duplex with The second error is that it held that the fair market value is just totally irrelevant in terms of temporary takings. And then the third error is that it improperly focused on perceived unfairnesses in the administrative process, really kind of returning back to a pre-lingual analysis about what's at that third character, the pen central factor about character of the regulation. And improperly placing all the burden of ensuring that Breezy Shores and Mr. Bordelon complied with the law on Baldwin County, totally relieving them, their architect, their licensed contractor, even their attorney at the time, his former counsel, of any responsibility for reading the zoning ordinance following the law. I mean, I think I'm missing where, regardless of the other issues you raise, I'm missing where your opponent actually did anything wrong. Because weren't parking setups of this type commonplace throughout the area? Yes, Your Honor. And part of that goes back to, so a big point in this case has been that, well, they had built this building right next door, it had stacked parking, they expected to build that. Before September 2017, you were only required to have two parking spaces per residential dwelling. So if you look back at the previous building, which was Easy Breezy, it actually complied with that regulation. It had two parking spaces, and then the extra parking spaces were stacked parking, but the minimum was actually met. And so what we have is that before the minimum number of parking spaces were increased in this particular planning district, these really didn't come up, because you only had to have two. Where it came up is whereas here, after the 2017 amendments, they had to have additional parking spaces. So to say that it was common, it was, but it was also legal. But didn't the official, though, approve this, right? Yes, initially. There was... But wasn't there, didn't the magistrate make findings that Baldwin County changed the interpretations of the existing law and passed new ordinances in order to hinder the ability of Breezy Shores and others to develop the land? I mean, wasn't that a finding that the magistrate made? So, yes, it did. And I will say this, that to the extent that those zoning ordinances were passed, it certainly was an attempt to regulate the land. But, and this is where I'm saying, this goes back to the point... It was passed intentionally, right? Well, Your Honor, that argument that it was targeted to Breezy Shores, that it was targeted at this development in particular, and that it was unfair, all of those claims, all of that argument had already taken place, and I think was appropriate to take place, and in the context of substantive due process claims. But the ordinance was changed because a neighboring landowner, Paul Stanton, complained, right? Well, not just Paul Stanton. So when I say the ordinance was changed, the ordinance was changed, the parking spaces were increased, and then subsequently the height restrictions were increased, because a great number of citizens complained about the safety issues that were coming from these... But in any event, he complied with the change in the interpretation or the change in the ordinance. He complied with it and eliminated stacked parking altogether, right? Yes. Okay. Yes. And did not challenge that decision. So the primary dispute has to be with the height requirement. Yes. He can't build a three-story residence. It has to be two stories. Yes. Okay. And so, why didn't he have a vested right to construct the duplex? A constitutional right, a vested right. Right. So... The first point to that is that the idea of whether he had a vested right under, say, state law, right, is separate from the idea of whether that is a takings claim. Okay. So whether he... Vested right under state law. Yes. Why doesn't he have a vested right under state law? Because, Your Honor, we argue because you are subject... You're building down at the beach. It's as well recognized that land use and zoning is not typically considered to be a very highly regulated industry. Building on the Gulf Coast is pretty much as highly regulated as you can. What if he had already built, say, the external frame of the structure? Do you think he would have had a vested right then? Yes. So, I mean, I can go down the line, right, to all of the... I think that's why the Supreme Court, and I know we're talking about a vested right rather than takings, but these decisions are always very fact-specific. So it might have been different if he had bought that land with intentions in his mind about what he was going to do with it. And in the meantime, the citizens of the town decided that they really wanted to kind of targeting a project and process that had already been permitted. There had been wide-scale zoning laws that would apply broadly. Why hadn't he made it far enough under the Alabama case law with the investments that had been put in in order to have a vested right?  And I also want to draw the court's attention, and I can submit a notice of supplemental authority. There's a more recent case out of Auburn, which is Dixon v. City of Auburn. It's not been reported yet. The number is SC-2022-0741. It was just released late October this past year after the briefing was completed. You don't have a... Government's going to make...governmental officials will make mistakes. This permanent...our position is that the permanent number should have been issued. And what the City of Auburn case says is it reinforces the previous, like, county, city, whatever, has not heretofore enforced something. It doesn't mean that you have a vested right to...that they will never enforce it or that a stop will can't be applied against the government. Basically, if the government made one mistake or chose not to enforce something in the past, it doesn't mean that they can't do it again. But he did get a permit for a three-story duplex. Did he ever get a permit? And then he was divested of his right? Yes. The landing certificate and billing permit were issued and then almost immediately... Yeah, so didn't the law say that you take into consider... take equitable factors into consideration? I mean, he got the permit and then the rug was pulled out from under him. And so why isn't that sufficient to establish a vested right? I understand this is separate from the constitutional issue. Whether or not it's a taking. Why not establish a vested right? Because he really hadn't done enough. I mean, the point of a vested right is, and if you look at the law... purchasing materials, applying for permits. The question, though, is what have you done? So anything that's been done up to that initial mistaken grant, we would argue really it's inappropriate to consider because at that point, that's all being done on speculation. And so if you look at this from what if... Right, this was very, very quick that this mistake was realized and it was pulled. But was a mistake realized because the zoning ordinance says that you can remove an LUC only, one, if there's been a false statement or misrepresentation of the application. I don't think that's been alleged. Or two, if the applicant fails to comply after a documented warning has been issued. That hasn't been alleged either. So it was entirely out of the ordinary for this permit to be rescinded. Sure, but the zoning ordinance is also clear. And actually on the face of the building permit that's issued, it's clear that it doesn't give you vested rights if there was a mistake of law, which is what happens here. The zoning ordinance does not give the zoning administrator or the planning and zoning staff authority to make decisions that are contrary to its plain terms, which is what the issuing of the Lane Use Certificate in this case was because it violated the clear terms of parking spaces and what that definition is supposed to be in terms of unimpeded ingress and egress. And so the fact that that was against the zoning ordinance and the plain language of the zoning ordinance, that's a mistake of law and that's not something that anybody can rely on. Particularly whereas here, you look at there really is no, you know, there were a couple of pillars going out. The mistake was caught. It would have been different. I don't think it's fair to characterize it as a mistake, though. There was an understandable lobbying effort from other property owners who wanted, the emails reflect that they want stringent parking regulations. And, you know, it appears pretty clear that people are frustrated with what's going on, but it's not that someone accidentally misread the ordinance. It's that things have been going on for some time that residents were frustrated with. Your Honor, I see my time has expired. You can answer. The definition of a parking space has long been in the ordinance and it is an area of 171 square feet, has to be at least 9 feet by 19 feet, connected to a street or alley by a driveway with unobstructed ingress and egress. And that's where the mistake comes in is allowing, you're supposed to have a certain number of parking spaces. The space has to be what the ordinance defines a parking space to be. Allowing stacked parking is against the clear language of that definition of a parking space because there's not an unimpeded ingress or egress. And so that was the mistake, and it was a mistake of law. And, you know, from that angle, nothing actually changed in the zoning ordinance. It just, they realized, oh wait, we have to start looking at this now because it's a factor now that we're not just looking at the two spaces. I have a few questions on another topic, if the presiding judge doesn't mind. What is the status of this property right now? Did the facility get built? We have not appealed the court's decision on the underlying administrative questions, so I'm honestly not sure where they are. Okay, then I'll ask opposing counsel. You made some arguments about the appropriate measure of damages. Can you talk about that briefly for us? Yes, ma'am. So compensation, well, first of all, the court clearly did not follow this court's decision in Wheeler, right, which lays out a clear formula based on fair market value of property. The Wheeler decision by the administration calculated return, calculated that out over the time period of the temporary takings. Instead, what the court did was look at so-called lost income. But didn't the Supreme Court say, and I can't remember which case, but sometimes fair market value might have even gone down, and so for a temporary taking, fair market value might not always adequately compensate the party. Well, the Supreme Court has stated, first of all, that you need to look at the, that's why you look at the value at the time of the taking. And so you don't, whatever's happened after that, you look at it at the time of the taking. So if it's gone down, then you're still looking at it at the time of the taking. But let's, I mean, let's say that a taking happened in 2018, and then the value went down in 2020 for a few brief months, right? The person would have, according to that calculation, no taking for that temporary measure. But, of course, we know that that was a temporary dip in the price. So isn't it true that fair market value doesn't always reflect the actual harm to the party? Right? Fair market value can go up and down based on a lot of things. And if you're talking about the value that the person lost out on for a temporary, concrete period of time, then maybe fair market value from A to B doesn't always adequately reflect that. Well, I think that's where this Court's Wheeler test, you start with the fair market value and then calculate the rate of return based on the difference. I think that that adequately accounts for that. The other issue with that that I would note here is about what the Court did instead was, well, first of all, there's not actually a finding that it wouldn't, right? That wasn't this case that the difference in fair market value wouldn't apply. I just said, oh, well, it's irrelevant without discussing Wheeler. I think, though, if you look at what has the plaintiff lost, well, in this case what the plaintiff lost was the right to build a three-story duplex, right? He could have built, at any point in time, though, a two-story duplex. The fact they chose not to do so during the pendency of litigation was a result of plaintiff's decisions. The county didn't make them. Of course, that also goes into the takings analysis. I'm sympathetic to that because I think a lot of the cases talk about, you know, removing all beneficial use of the property. On the other hand, if you make an investment in a property expecting the income from a three-story building, you can't, I don't think, I'm not an architect, but I think it's very challenging to add a third story to a second story, to a two-story building once you get all that sorted out. So, I mean, I suppose that the party could have done that, but then that might have resulted in an astronomically higher amount of damages if the court ultimately concluded that there had been a taking, right? Rental income into the future for the difference between a two-story or a three-story building. Well, Your Honor, part of the issue here is that there wasn't actually any kind of meaningful analysis. Plaintiff never did any kind of meaningful analysis about the difference. And then the other point to that is we do object to the use of rental income in this way as a proxy for value, particularly when plaintiff's own experts, Franklin Reed, who is a well-known appraiser, quite frankly, we use him ourselves for other cases, testified that the income approach to value for this particular property down at the beach, that that was inappropriate and that he didn't even consider it. He only looked at, you know, the cost approach and sales comparisons approach. So, at least in this case, focusing exclusively on income when their own expert has said, look, that's really not a good way to peg value in this case, we think was inappropriate. And quite frankly, was a windfall, particularly when you look at the fact, one of the factors, the reasons that this took so long is because the plaintiff, you know, went from this, this was an appeal of an administrative action in the second amendment complaint, which we had to have that because the first one was brought under the wrong statute. They ended up alleging at least, counting charitably, 47 different claims in 10 counts brought against one or more of the four defendants, including procedural and substantive due process, equal protection, first amendment, negligence, wantonness, and my favorite, dormant commerce clause. Which I have to admit, took a little time to get in. Because everybody said, well, you know, you use it. So, to award the lost rental over the entirety of the course of this litigation, when it was expanded so much because of choices that plaintiff made, is unjust. And takings and compensation takings is fundamentally supposed to be an equitable doctrine. This is not at all equitable to the citizens of Baldwin County. Thank you. All right. Thank you, Ms. Frawley. Mr. Houghton. Thank you, Your Honor. May it please the court, Jonathan Houghton with Pacific Legal Foundation on behalf of the respondents, Breezy Shores and Mike Borderline. And I think first I'd like to address Justice Grant's question about whether or not we've built. We have not, Your Honor, because it wouldn't be prudent to do so right now. One of the allegations of the county in this case is that we did not have a vested right to build two stories. And we thought, particularly given that we have construction costs. To build two or three? I'm sorry, three, Your Honor. I misspoke. Thank you. We thought that it would be prudent not to spend over a million dollars in construction costs when they are challenging our vested right to build three stories in light of the story ordinance. This case, Your Honors, is largely about questions of fact. Actually, before we get off that topic, I do want to ask, what's your response to her point that this litigation was perhaps drawn out unnecessarily by a wide variety of claims that wasn't pursued expeditiously? And maybe in that context, even assuming that we agree with you all and everything else, that that measure of damages is inappropriately expensive. I disagree with that. Without contention of the county, Your Honor, the claim wasn't drawn out. We filed our complaint based upon the taking of a vested property right. The court vindicated that claim and said there was a taking of a vested property right. And the proper measure of damages is the lost income during that period. What was the First Amendment claim? To be honest, Your Honor, I don't know. Or dormant commerce clause? I guess the point is it wasn't just a takings complaint. Or maybe I think it's fair to say there may be some due process elements that were fair to plead. But it sounds pretty expensive. But at the end of the day, Your Honor, the court found a regulatory taking. And there was no claim here that this case – there's no issue here that this case went on for three years instead of two years instead of one year because of those claims. Those claims were dismissed at summary judgment. And quite frankly, our just compensation cannot be burdened by the time that it takes things to go through the court system. We filed our complaint. There was a summary judgment motion. We had a trial. The court issued his decision. And the court, we believe, issued his decision fairly based upon the undisputed facts. But there is no case law that allows just compensation to be diminished by the time it takes a case to go through the court system. On a different topic, it seems fair to say that this case is affected by the kind of stench of apparent underhanded dealings rather than what you might expect ordinarily to happen. How much of your claim is based on the fact that everything wasn't on the up and up? Had there been a true mistake in this permit rather than rescinding the permit, it appears due to pressure of surrounding landowners. And had there been, I think it was Fish and Wildlife Service, that was just how long it ordinarily took a permit to come through, all of those things. How much do those allegations of more underhanded conduct affect the outcome here? Partly, Your Honor, but quite frankly, not much. The first is it comes in with respect to the vested permit. And it comes in with respect to the character prong of Penn Central. With respect to the vested permit, the court found categorically that no mistake was made. And it found that based upon the undisputed evidence from the county itself. Vincent Jackson said that no mistake was made in granting the permit. He said that the individual who granted the permit, Crystal Bates, didn't make a mistake. He said that she was never disciplined for it. And the courts found that categorically, based upon the facts, no mistake was made. As a part of that... Is that a legal or a factual conclusion, do you think? That's a factual conclusion, Your Honor. As a part of that, the trial court also found that this vested permit right was taken away because the county was following the wishes, essentially, of Paul Stanton. But that being said, Your Honor, the fact that the county undisputedly said that this was not a mistake is enough. Second, Your Honor, the issue with respect to Paul Stanton comes in with respect to the character prong of Penn Central. The court went through Penn Central. It found that the character prong based upon the undisputed facts favored Breezy Shores. It found the same things with respect to investment backed expectations and economic impact. And under the character prong, it found that the magnitude and severity of this regulatory action was such that Breezy Shores was being singled out. Part of the singling out, of course, is due to the fact that the court found that this had nothing to do with public health, safety, or welfare and everything to do with Paul Stanton. Well, weren't there allegations that it would be hard for emergency vehicles to get through and dangers related to that sort of thing? From Paul Stanton, Your Honor. There was nothing from that from the government. The government was completely silent as to why they made this change. That came from Paul Stanton in an email to Vincent Jackson. And Paul Stanton does not have the delegated authority to make public health, safety, and welfare decisions on behalf of Baldwin County. Is the rule now that any, setting aside whatever vested rights are in this property, that buildings are limited to two stories? Is that the new regulation? Yes, Your Honor. They're limited to two stories, and I do want to clarify something that came up earlier in the argument. This is a story ordinance, not a height ordinance. The height is at 35 feet, and the height when it was three stories was 35 feet. So the height hasn't changed. And that was one of the factual findings of the trial court because what they found was that one of the allegations at trial was that it went from three stories to two stories because of fire safety. And the trial court said that was illusory because before you had a 35-foot building, after you have a 35-foot building, and this change based upon alleged fire safety was illusory. That was a factual finding by the trial court. Additionally, the trial court also made a factual finding, and this is going back to the claim made by Paul Stanton, not the government, about parking. The trial court also made a factual finding that the few extra rooms that are going to be present for a three-story versus a four-story would not cause any parking problems. And that using that as a rationale was illogical and contrary to common sense. Is that illogical if you have a seven-bedroom versus a five-bedroom? I think this is obviously designed for large groups of people to come together. Wouldn't more bedrooms typically mean more cars, especially in Gulf Shores where it's not like everyone is flying and then taking the subway to the house? Quite frankly, there are. I could see how it could, and I could see how it couldn't. If you're talking about a family with kids, it's really not going to add any cars at all. But I think we're straying a little bit from the point here in that the court found that the taking of the vested right to build three-story with stacked parking was a Penn Central taking, going through all of the Penn Central factors. So the story ordinance aside, and I'm sorry, Your Honor. The problem that I have with that argument is that when we look at other cases applying the Penn Central versus City of New York factors, none of those cases support the conclusion that lost rental income or increased construction costs support a regulatory taking. Baytree versus City of Lauderhill. Denial of a 327-unit residential apartment complex after rezoning. Not an unlawful taking. Nassar versus City of Homewood. Rezoning a property from multifamily to single-family residential use, reducing property value by half. Not an unlawful taking. All you have here is what? How much do you have? What, $730,000 of lost rental income and increased construction costs? Why is that severe enough to constitute a regulatory taking when we compare what he lost with others lost applying the Penn Central factors? Yes. There are two responses to that, Your Honor. The first is going through the Penn Central test. It's an ad hoc test based upon all facts and circumstances, and the court has to go through all three factors. Economic impact, reasonable investment-backed expectations, and character. In this particular case, the trial court found, based on undisputed facts, that all three factors weighed in Breezy Shore's favor. This is not a case where two of the three went for the county, and the court put everything based on economic impact. So what's the economic loss? The economic loss here, Your Honor, as the court found, was $600,000, the lost rental income. That's enough to constitute a regulatory taking? Yes, Your Honor. But it coupled with the unequivocal destruction of reasonable investment-backed expectations and the singling out of this property owner to bear a public cost that no one else in Baldwin County was prepared to do. Penn Central is not a one-factor test, Your Honor. If the sole determining factor of Penn Central was how much money did you lose, then it would be an entirely different constitutional test. First Evangelical Lutheran Church of Glendale v. L.A. County. Changes in zoning ordinances and denial of variances are regulatory takings that are not normally invalidated by the courts. All we have here is just a shift from a three-story to a two-story rental unit, right? He's already complied with the stacked parking requirement. The only thing he's looking at is loss of rents and increased construction costs. And you're going to tell me that's severe enough to constitute a taking when we take Baytree and Nassar into consideration? First, Your Honor, for Baytree, now that it's come up twice, Baytree was abrogated bilingual. And I want to be really clear on that because when Baytree went through its decision and it said there was no taking of a vested permit, it did so based upon the Supreme Court's decision in Agins. Baytree said that there was a taking of a vested permit. However, because there was a substantial government interest, we're not going to find a taking here based on Agins. That was specifically abrogated by the Supreme Court's decision in Lingle. So Baytree made a decision that there was no taking based on bad law. Well, Lingle abrogated South Grandview v. City of Alabaster permitting an inquiry into the rationale behind the regulation. We don't look at the rationale behind the regulation anymore, but we do take into consideration the economic loss and the character. And when you take those factors into consideration, I have a hard time coming to the conclusion that $730,000 in lost rental income and increased construction costs when you get to build your two-story duplex, waterfront two-story duplex, he's going to make some money off it. That's enough to constitute a taking under the Fifth Amendment. Yes, Your Honor, but I think we have to focus on what the taking is. Can I ask you a question? Yes. A taking does not have to be permanent. A taking can be for a short period of time. And the United States Supreme Court has held that. They have absolutely held that, yes, Your Honor. And that's what this trial court found here. And I think what's important to focus on is that the taking here was of a vested permit right. They had the right to build three stories with stacked parking. That was a vested right under Alabama law based upon undisputed facts found by the trial court. So this isn't simply complaining about a down payment. This is the taking of a vested property right, a separate property right under Alabama law. And also, Your Honor, it's not just about economic impact. In terms of investment-backed expectations based upon the undisputed facts, the court said that it would unequivocally, unequivocally was the court used that investment-backed expectations were taken. And with respect to categories, it said that categorically this was not a mistake, that there was no public purpose here, that Breezy Shores was singled out, that there was no implication of public health, safety, or welfare. It's all of those things combined, Your Honor. And because that's what makes Penn Central the multi-factor ad hoc test that it is. And putting all of those together, I see my time is complete, Your Honor. We have a taking of a vested property. All right. We have your argument. Thank you, Mr. Houghton, Ms. Frawley. You deserve some time for rebuttal. Thank you, Your Honor. Thank you. Why isn't this a temporary taking sufficient to constitute a violation of the Fifth Amendment? Because what was actually taken from the owner was, as Your Honor pointed out, just the right to build this three-story taking. One of the main things that they— So he's not being deprived of an opportunity to build his duplex. It's just, it's got to be two stories instead of three, and that's it. Yes, Your Honor. One of the things I noticed that opposing counsel just admitted that they argue, well, the unfairness comes in with character prong of that test, while then simultaneously attempting to use lingual as an argument that all other taking jurisprudence was abrogated. The whole point of lingual is that character looks to whether this is like a physical taking, whether you're saying you can't build or whether we are just restricting your right to how you build something. I'm not sure about that. I think what lingual was trying to get rid of was this idea that, well, the government can take your property if it has a really good reason. I think lingual was saying the government has the authority to take property for public purposes, but when it does so, it has to compensate the person that it's taken that property from. So here, it may be better for, you know, Paul Stenton or even the rest of the community if this three-story building isn't built, but it's not clear that the owner with a vested interest is the one who has to bear that burden for the community. Instead, the community has to pay for that. Why is that an incorrect reading? Yeah, I think what lingual did was it moved the issue of whether there's a sufficient governmental reason and, quite frankly, whether there was any kind of other unfairness or whatever other reasons to invalidate. Right? What you had is that you couldn't prelingual. You brought a takings claim, and you could either get compensation or invalidate it under the takings clause. After lingual, you're only looking at compensation. And as a matter of fact, but if you look at all these prelingual cases, right, in cases like Baytree where they found no takings, they necessarily did both analyses, and so it didn't abrogate that portion of it. All of this, whether it was unfair, whether it was right, you know, the regulatory record, that had already been decided. Now, I want to note that if you look back at the trial transfer, it's actually the plaintiff's attorney objected to the relevance of any kind of testimony about the purpose behind the parking and the store licenses, but the regulatory record is in the record, and it is extensive. Your Honor, I see my time is expiring. All right. Thank you, Ms. Frawley and Mr. Houghton, and the court will be in recess for 15 minutes. Goodbye.